Filed 10/6/23  In re M.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | C097947 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>C.C.,<br><br>　　　　Defendant and Appellant. | (Super. Ct. No. JV2020-0222) |

Appellant C.C., mother of the minor, M.C., appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code,[1] §§ 366.26, 395.)  Mother contends that the juvenile court erred by:  (1) finding the

---

[1]　　Undesignated statutory references are to the Welfare and Institutions Code.

1

section 366.26, subdivision (c)(1)(B)(i) beneficial parental relationship exception did not apply to prevent the termination of parental rights; and (2) the Yolo County Health and Human Services Agency (Agency) failed to comply with the inquiry requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). We will conditionally affirm subject to full compliance with the ICWA on remand, as described in this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Initial Dependency Proceedings*

The minor was born prematurely at 28 weeks gestation and remained in the neonatal intensive care unit (NICU) from the time of her birth until the time of detention. On November 3, 2020, the Agency filed a petition alleging that the minor (then age two months) came within the provision of section 300, subdivision (b)(1) (failure to protect). The petition alleged that the minor was at substantial risk of harm due to the mother's unstable mental health; alcohol abuse by the father of the minor, S.D.; and domestic violence. The minor was placed into protective custody. The Agency's detention report stated that the minor had undergone hernia surgery and was on oxygen 24 hours a day. Mother tested positive for marijuana and amphetamine. Mother reported she had Cherokee ancestry and father reported he had Cherokee and Blackfeet ancestry.

At the detention hearing on November 4, 2020, the juvenile court ordered the minor detained and ordered video visits for the parents. The court found there was a reason to believe that the minor may be an Indian child, and the Agency was ordered to complete further inquiry.

II

*Jurisdiction And Disposition*

The Agency's December 9, 2020 jurisdiction/disposition report recommended sustaining the petition, removing the minor from the parents' care, and providing reunification services to mother. The Agency recommended providing reunification

2

services to father if he was found to be the biological or presumed father. The report noted that the father spoke with the social worker and claimed that he had Cherokee and Comanche ancestry, not Blackfeet. Mother reported to the social worker that she no longer thought she had Cherokee ancestry based on the results of a DNA test. The social worker reported sending notices of child custody proceeding for Indian child (ICWA-030) forms with detailed family information to the Cherokee Nation, Eastern Band of Cherokee Indians, United Keetoowah Band of Cherokee Indians, and the Comanche Nation. However, as to mother, the notices indicated that any Indian tribe or band was "none" or "unknown" and possible Indian ancestry to search for the maternal side was not listed. As to father's paternity, the ICWA notices indicated that the parentage of the minor was "unknown." The Agency received responses from the Cherokee Nation, the Eastern Band of Cherokee Indians, the Comanche Nation, and the United Keetoowah Band of Cherokee Indians advising that the minor was not eligible for membership.

At the December 9, 2020 jurisdiction and disposition hearing, the minor's counsel informed the juvenile court that the minor's condition had worsened. The juvenile court continued the hearing, pending paternity test results. On January 4, 2021, the Agency learned that the minor would need a gastrostomy tube. The minor's pediatrician recommended that due to the minor's medical condition, she should not have contact with anyone outside the foster placement and essential medical personnel.

On January 11, 2021, the juvenile court took jurisdiction, found the father to be the presumed father, and ordered family reunification services to both parents. The court would not allow in-person visits until the minor's pediatrician advised it was safe for the minor.

At the time of the subsequent visitation review on March 8, 2021, the minor continued to be dependent on the gastrostomy tube, oxygen, and various machines and medications. The minor was diagnosed with bronchopulmonary dysplasia, developmental delay, abnormal muscle tone, chronic lung disease of prematurity,

3

dysphagia, cerebral palsy, static encephalopathy, ventricular septal defect, visual impairment, gastroesophageal reflux, seizures, patent foramen ovale, anemia of prematurity, respiratory distress syndrome, congenital heart disease, immature retina, and retinopathy of prematurity level 3.  At the visitation review hearing, the juvenile court declined to allow in-person visits and set a further review of visitation.

In April 2021, the minor's pediatrician continued to recommend against in-person visits until mother obtained her own housing because she was living in a communal setting, and the COVID-19 pandemic posed a high risk to the minor.  In June 2021, the juvenile court authorized mother to attend in-person medical appointments and in-person visits after obtaining safe housing.

### III

*Status Review*

The Agency's July 12, 2021 six-month status review report recommended terminating services to father and continuing services to mother.  Mother participated in the minor's medical appointments in person and had video visits with the minor three hours per week and the visits were generally positive.

On July 19, 2021, the juvenile court held the six-month review hearing, and mother submitted on the recommendation but argued that the Agency did not provide reasonable services because there were no in-person visits.  The court terminated father's services, continued services to mother, and set a visitation review.  The court found that the Agency provided reasonable services and ordered that mother would have supervised in-person visits with a medical professional present.

At the 12-month status review hearing, the juvenile court ordered further services to mother on the Agency's recommendation.  The Agency retained a registered nurse to monitor the minor's medical needs during visits and provide training to mother.

In its 18-month status review report, the Agency recommended ceasing services to mother because she remained incapable of safely caring for the minor despite extensive

4

medical training and continued to struggle with tasks like changing the minor's clothes and detangling the minor's medical cords. Mother did not request return of the minor but instead requested an additional six months of services. The registered nurse tasked with training mother expressed the opinion that mother would require full-time home support to be able to care for the minor. The minor struggled after visits with mother, becoming fatigued, irritable, and adverse to touch; these issues improved somewhat by adding rest time to visits and dimming the lights, but the issues worsened each time visits with mother increased. At the July 25, 2022 contested 18-month review hearing, the juvenile court found clear and convincing evidence that return would create a substantial risk of detriment and that offering more services would not be in the minor's best interests. The court then terminated reunification services to mother and set a selection and implementation hearing pursuant to section 366.26.

IV

*Section 366.26 Hearing*

On November 15, 2022, the Agency filed a section 366.26 report recommending termination of parental rights with a plan of adoption. The minor was also diagnosed with autism spectrum disorder, level 3, which will require lifelong care. At medical appointments, mother was unable to perform simple tasks to care for the minor and continued to be argumentative or dismissive of the minor's issues. It was reported that mother would repeatedly pick up the minor to hold her despite the minor wiggling away from mother. At many of the visits, the minor exhibited signs of stress, tiredness, or unhappiness. The minor was reported to respond better to virtual visits with mother when she could be comfortable in her home environment.

At the contested section 366.26 hearing on January 18, 2023, mother presented no witnesses or evidence. The social worker testified that the minor was physically exhausted after visits. The minor demonstrated reflexive eye rolling when in-person visits started with mom, but that decreased when visits with mother decreased. The

social worker testified that she did not believe there would be any detriment to the minor if visits with mother ended and the minor was not getting any benefit from the visits, which benefitted mother more than the minor. She testified that the benefits of permanency outweighed any relationship or visits with mother.

The juvenile court found by clear and convincing evidence it was likely the minor would be adopted, none of the exceptions pursuant to section 366.26, subdivision (c)(1) existed, termination of parental rights would not be detrimental to the minor, and it was in the best interest of the minor to terminate parental rights. As to the beneficial parental relationship exception, the court found that the first element of consistent visitation was met. But the court then found that mother failed to meet her burden to show a significant positive emotional attachment and the level of detriment to the minor in terminating parental rights would outweigh the benefit to the minor of placement in an adoptive home. The court reasoned that: "[Mother] has faithfully visited, but I don't see and I haven't seen ever where the visits have been for [the minor's] benefit. They have always been for [mother's] benefit; [mother] trying to learn how to take care of her, [mother] wanting to spend time with this baby, but they've been difficult for [the minor]. They make her tired. They make her sick. They give her problems, and yet we still tried and tried and tried to give [mother] that chance. It's just not there, and I don't think [the minor] has bonded at all with her mother." The court further reasoned that the visitation notes did not evidence a significant bond between the minor and the mother, and because the court could not find such a bond, "the benefit of maintaining that relationship certainly is not going to outweigh the benefits of being adopted."

The juvenile court then ordered the parents' parental rights terminated and freed the minor for adoption. The court also found: "This child is not an Indian child, and [the] ICWA does not apply."

6

DISCUSSION

I

*Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied based on her relationship with the minor. She argues that the juvenile court erred in its analysis under *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*) by discussing improper factors and because the evidence supported application of the exception. We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C.*, *supra*, 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that

attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the fact that mother consistently visited the minor was undisputed. As to the second element, the juvenile court conducted a detailed analysis and found that there was not a significant positive emotional attachment between mother and the minor. As to the third element, the juvenile court concluded because there was no significant bond, mother could not meet her burden to establish that termination of the positive attachment would be detrimental to the minor. From the time she left the NICU months after birth, the minor spent two years in her placement with her caregivers, while mother's contact with the minor was limited to visits. The juvenile court found those visits were not always positive, causing the minor distress, illness, and exhaustion.

Mother presented no evidence or testimony to meet her burden of establishing a substantial positive bond. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) Conversely, the Agency provided the juvenile court with sufficient evidence, including reports on visitation and testimony from the social worker, to determine the minor did not have the kind of relationship with mother that would trigger the beneficial parental relationship exception. Mother relies extensively on a report and testimony during the 18-month

8

review from the nurse who trained mother, who stated that she thought there was a bond between mother and the minor because there was eye contact and the minor responded to mother during visits. However, this testimony was both earlier in the case and refuted by a psychological evaluation of the minor finding that "[s]he displayed no non-verbal behaviors, such as eye contact or use of gestures." (Italics omitted.) Additionally, there is no indication in the record that the juvenile court relied on the opinion of the nurse from the earlier proceeding in finding that the beneficial parental relationship exception did not apply at the section 366.26 hearing. Further, we do not reweigh the credibility of witnesses. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

There was no significant evidence that the minor would benefit from continuing the relationship. While she appeared to sometimes enjoy her visits, there were many visits where she pulled away from mother or returned home from the visits exhausted and stressed. The minor had significant developmental and language delays and was not capable of expressing if she was excited to see mother, sad to see her leave, or if she missed her between visits. The record supports the juvenile court's finding that the visits were physically demanding of the minor and did not significantly benefit her. In light of the evidence in the record that we have set forth *ante*, as well as the stability the minor enjoyed in her caregivers' home, there was a dearth of evidence demonstrating the minor would suffer detriment from the loss of a significant bond if parental rights were terminated.

Mother further contends that the juvenile court applied improper factors when, at the outset of its analysis, the court summarized the case and noted that mother clearly loved the minor and had made efforts toward reunification but was not in a position to take the minor. The contention lacks merit. The court followed this preface by stating: "Right now, this isn't a question of whether or not she's going back to mom. It's a question of whether or not she's adoptable, and she is." The court then followed this

9

finding that the minor was adoptable with a detailed analysis of the beneficial parental relationship exception in accordance with *Caden C.*, applying the factors appropriately.

Having considered both the evidence and oral argument, and noting mother had the burden to show the exception applied, the juvenile court found there was insufficient evidence of a significant bond and of detriment, appropriately comparing the harm caused by the termination of the parental relationship to the benefits of an adoptive home, as required under *Caden C.* (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home"].) We conclude the juvenile court's finding is well supported by the record. The court did not err in finding the beneficial parental relationship exception did not apply.

## II

### *The ICWA*

Mother contends that the Agency and the juvenile court failed to comply with their duty of further ICWA inquiry after the initial inquiry showed there was reason to believe the minor may be an Indian child. Specifically, she contends that while the Agency performed some inquiry as to the father's claims of Indian ancestry, the notice to the tribes failed to include mother's reported Indian ancestry and the adjudication of father's paternity, and the record does not show that the Agency inquired with mother's extended family. We agree and, as we explain, the failure to fully comply with the requirements of the ICWA requires remand for further proceedings.

As this court recently explained: " 'The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect "Indian children who are members of or are eligible for membership in an

10

Indian tribe." [Citation.]' (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an ' "Indian child" ' as a child who 'is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).) The juvenile court and the social services [agency] have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)" (*In re G.A.* (2022) 81 Cal.App.5th 355, 360, review granted Oct. 12, 2022, S276056.)

"[S]ection 224.2 creates three distinct duties regarding [the] ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id*., subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id*., subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) We review claims of inadequate inquiry into a child's Native American ancestry for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.)

Here, mother's disclosure that she had Cherokee ancestry and father's disclosure that he had Cherokee or Comanche ancestry gave the Agency and the juvenile court "reason to believe" the minor was an Indian child within the meaning of the ICWA, triggering the Agency's duty of "further inquiry" under the ICWA. (*In re T.G.* (2020)

11

58 Cal.App.5th 275, 292; see *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1052; see also § 224.2, subd. (e)(1), (2).)  The Agency was thus required to follow the provisions set forth in section 224.2.  Further inquiry includes interviewing the parents, Indian custodian, and extended family members to gather available familial and tribal enrollment information.  (§§ 224.2, subd. (e)(2)(A); 224.3, subd. (a)(5).)  Further inquiry also includes contacting the Bureau of Indian Affairs and State Department of Social Services for assistance with identifying tribes in which the child may be a member of or eligible for membership.  (§ 224.2, subd. (e)(2)(B).)  Finally, further inquiry also includes contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.  (§ 224.2, subd. (e)(2)(C).)  "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the [ICWA]" and "include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case."  (*Ibid.*)

Here, the Agency's reports indicate that it undertook an inquiry of the father's family and sent notices to the tribes with extensive family information, and the tribes advised the minor was not eligible for enrollment.  However, the record does not disclose that the Agency inquired with *any* maternal relatives about her claim.  Although mother later claimed that she took a DNA test and did not have Cherokee ancestry, this is not dispositive and did not discharge the Agency's duty of further inquiry regarding mother's claim under section 224.2, subdivision (e)(2).  Because of this error, the notices to the tribes did not accurately disclose mother's claim and pertinent family history.  (See *In re K.T.* (2022) 76 Cal.App.5th 732, 744 [a child welfare agency "does not discharge [its] duty of further inquiry until [it] make[s] a 'meaningful effort' to locate and interview extended family members"].)  Further, the record does not show that the Agency made an adequate effort to update the tribes with the minor's parentage information once father's

paternity was determined. While the Agency correctly asserts it was not required to complete an ICWA-030 form and was only required to share with the tribes "information identified by the tribe as necessary for the tribe to make a membership or eligibility determination," an essential part of that information surely must include the mother's claim of Cherokee heritage, which was fully omitted. (§ 224.2, subd. (e)(1)(C).) We cannot say these errors were harmless. The Agency should have, at a minimum, after conducting further inquiry with relatives, listed what information it was able to gather from these sources and provided information regarding mother's claim of Cherokee ancestry to the tribes. (§ 224.2, subd. (e)(2)(C).) For these reasons, we conclude the Agency did not adequately discharge its duty of *further inquiry*, and as such, the juvenile court's finding that the ICWA did not apply was not supported by substantial evidence. (See *In re Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1430.)

Limited remand is necessary for the Agency to adequately discharge its duty of further inquiry under section 224.2. If that further inquiry results in a reason to know the minor is an Indian child within the meaning of the ICWA, then the formal notice requirements of section 224.3 apply. The Agency either did not take sufficient affirmative steps to investigate the minor's possible Indian ancestry on the maternal side or did not document its efforts to do so, and the juvenile court failed to ensure that an adequate investigation had been conducted. In the absence of evidence of the Agency's efforts to fulfill its continuing duty of inquiry, we cannot say the failure of ICWA compliance was harmless. A failure to conduct a proper ICWA inquiry requires a limited remand for proper inquiry and any required notice. (*In re A.B.* (2008) 164 Cal.App.4th 832, 839; *In re D.T.* (2003) 113 Cal.App.4th 1449, 1454-1456.) We must therefore remand for limited proceedings consistent with this opinion.

## DISPOSITION

The orders terminating parental rights are conditionally affirmed subject only to full compliance with the ICWA as described in this opinion. If, on remand, the juvenile court determines the ICWA applies, the court shall vacate its previous orders terminating parental rights and conduct further proceedings consistent with the ICWA, including a new section 366.26 hearing. (25 U.S.C. § 1914; § 224, subd. (e).)


/s/
ROBIE, Acting P. J.



We concur:



/s/
KRAUSE, J.



/s/
BOULWARE EURIE, J.

14